IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| LAVERNE LAVARIAS, | ) | CV. NO. 06-00481 DAE-LEK |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| HUI O KA KOA, LLC, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT

On November 5, 2007, the Court heard Defendant's Motion for

Summary Judgment.   Andre S. Wooten, Esq., appeared at the hearing on behalf of

Plaintiff; Brad Miller, Esq., appeared at the hearing on behalf of Defendant via

telephone.  After reviewing the motion and the supporting and opposing

memoranda, the Court GRANTS IN PART AND DENIES IN PART Defendant's

Motion for Summary Judgment.  Genuine issues of material fact exist concerning

Plaintiff's retaliation claim against Defendant under Title VII and Haw. Rev. Stat.

chapter 378.

BACKGROUND

On September 6, 2006, Plaintiff Laverne Lavarias filed a Complaint, alleging five causes of action against Hui O'Kakoa Security ("HOKK") and George Williams.  In an Order Granting Defendants' Motion for Judgment on the Pleadings, the Court granted Defendants' motion, dismissing all causes of action against George Williams and dismissing Count II (Violations of Title IX) against both Defendants.  The only remaining counts were against HOKK, that is, Count 1 (Title VII, Retaliation), Count III ( Hawaii Revised Statutes ("Haw. Rev. Stat.") Chapter 378), and Count IV (Title VII, Sexual Harassment).[1]  Thus, the only pending claims against HOKK pertain to retaliation and sexual harassment.

In 2005, Plaintiff was employed as a security guard for HOKK. (Complaint ¶ 5.)  HOKK is a private business in the City and County of Honolulu, State of Hawaii, which specializes in providing physical security to its clients through security guards that it hires and trains.  (Id. ¶ 2.)  HOKK assigned Plaintiff to work at the Halawa Gate at Pearl Harbor Naval Base, where HOKK provides security services to the United States Navy/Department of Defense.  Plaintiff's

---

[1]      Plaintiff also alleged a claim under Count III pursuant to Haw. Rev. Stat. § 368, which involves the civil rights commission.  The Court will entertain Plaintiff's claim pursuant to Haw. Rev. Stat. § 378 only because Section 368 is not relevant to the instant cause of action.

position required her to check identification cards and vehicle pass stickers in front of the guard shack, which required her to remain stationary.  (Plaintiff's Deposition at 55.)  On August 22, 2005, while on duty, Plaintiff left her guard post to use a women's restroom, which was located in a "D.O.D. [Department of Defense] or MP [military police] area" at the Gantry, near the Halawa Gate.  (Id.; Plaintiff's Ex. 21.)  The Gantry is approximately 100 yards from Halawa Gate.  (Pl's Ex. 21 at 2.) Plaintiff had left her post to use that restroom before that day, during which times she had not run into any problems.  (Pl's Dep. at 57-58.)

On the day in question, Plaintiff went to the restroom, where she undressed partially in front of a sink to cool off from the hot day (after 1:00 p.m.). (Id. at 63-64.)  She was wearing a bullet-proof vest under her clothes, which made her even warmer.  At some point she heard a noise, causing her to look back to see a man staring at her while she was washing.  (Id. at 64.)  The man was in a stall, peering through a space, and Plaintiff could see military boots, a gun belt, and an army uniform on the man.  (Id.)  Upon identifying the boots as those belonging to a man, she ran out of the bathroom to her post.  (Id. at 65.)  She had no physical contact with the man, and the incident lasted a matter of minutes.  (Id. at 64-65, 67.)  The man subsequently was identified as a male MP for the Department of the Navy.  (Id.)

Upon returning to her post, Plaintiff asked other D.O.D. personnel why a man was in the women's restroom, which question, Plaintiff testified in her deposition, was met with laughter.  (Id. at 65.)  Plaintiff then requested to speak to a supervisor.  Assistant Supervisor Atabay arrived, to whom Plaintiff relayed her story.  (Id. at 65; Pl's Ex. 21.)  That same day, Plaintiff sought medical care on an emergency basis from Laurence Rotkin, MD, at Castle Medical Center.  (Pl's Ex. 22.)

Two days later, on August 24, 2005, the Site Manager, Clarence Watson, assigned Supervisor Captain Myles Ito to initiate a report.  (Pl's Ex. 21.)  Ito was Atabay's superior; Watson was Ito's superior; and Williams (who originally was a defendant in this case) was Watson's superior.  (Pl's Depo. at 67.)  Ito's report stated that Plaintiff's statement was basically the same as that given to Assistant Supervisor Atabay on the date of the incident.[2]  The report noted Plaintiff's condition as "appear[ing] uncomfortable and worried about this whole situation."  (Pl's Ex. 21 at 2.)  Plaintiff "also asked if she was going to lose her job, and became emotional and began to cry."  (Id.)  Plaintiff further indicated that she felt "that she [could not] return back to work and perform her duties because she

---

[2]     Ito's report refers to Plaintiff as "Laverne Kealoha," rather than "Laverne Lavarias," indicating a subsequent name change.

[felt] nervous and uncomfortable to face people"; she wanted to seek treatment before returning back to work.  (Id.)

Ito found that Plaintiff "was within a female's restroom with permission," while "[t]he male suspect had no business being there."  (Pl's Ex. 21 at 2.)  Ito further found: "There is no doubt that this incident did occur.  The whole incident may have been prevented if [Plaintiff] had followed procedures and called our van driver's for a bathroom break.  [Plaintiff] left her assigned post to use the gantry bathroom.  This left only one of our guards on sentry duty at Halawa Gate which is always manned with a minimum of two guards."  (Id. at 2-3.)

On August 24, 2005, August 26, 2005, and September 27, 2005, Plaintiff sought additional care from Dr. Rotkin.  (Pl's Ex. 24.)  On August 26, 2005, Dr. Rotkin noted that Plaintiff could return to work on September 5, 2005, with the limitation that she suffered from work-related anxiety.  (Pl's Ex. 23.)  Around September 1, 2005, Plaintiff sought treatment from a clinical psychologist, Kari Vasey, who recommended that Plaintiff take a 30-day absence from work for "work-related anxiety and depressive symptoms."  (Pl's Ex. 27.)  Plaintiff took a longer leave from work because she still was under the care of a physician from October 17, 2005 to November 20, 2005, who did not recommend that Plaintiff return to work until November 21, 2005.  (Pl's Ex. 25, 26.)

5

Upon return to work in November, Plaintiff learned that she had been placed on a supplemental list due to an alleged problem concerning a pardon that she previously had received from the Governor's Office in 1986.  (Def's Ex. H.) Previously, in June 2005, in response to Plaintiff's completion of a firearms course that April, Defendant had sought clarification of that pardon to determine whether Plaintiff was allowed to carry a firearm as part of her position.  (Id.; Pl's Ex. 10, 11.)  In November 1986, Plaintiff was granted a "full and free pardon" from a conviction in the First Circuit Court, Honolulu, Hawaii for a violation of Haw. Rev. Stat. § 708-831, Theft in the First Degree.  (Def's Ex. D.)  Defendant claims that it sought clarification, after Plaintiff completed the firearms course, because of a letter from the Department of the Attorney General, dated October 14, 1981. (Def's Ex. S.)  That letter noted that "the mere granting of a pardon by the Governor [does not necessarily] relieve[] persons with past felony convictions of any disability relating to the possession of firearms."  (Id.)  There are exemptions to that rule, but none of them appear to apply here because Defendant is a private employer.[3]  (Id.)

---

[3]     None of the parties argue that any of the exemptions apply to the instant situation.

Accordingly, Defendant sought clarification from then-Governor, George Ariyoshi, who had granted the pardon, and, on July 19, 2005, Ariyoshi issued a letter of his intent in pardoning Plaintiff.  In that letter, Ariyoshi stated that he had intended, through his pardon, to grant Plaintiff "the right to bear arms in her work."  (Def's Ex. E, G.)  Defendant was not satisfied that Ariyoshi's intent letter would relieve it of criminal liability because Ariyoshi was not the Governor of Hawaii anymore and, thus, Defendant did not believe that his opinion was controlling.  (Reply at 5 (noting that "[w]ithout intending any disrespect to former Governor Ariyoshi's opinion as a private attorney, it is simply that – the opinion of a private attorney," who cannot "insulate Defendant from potential criminal liability" if his opinion turns out to be incorrect)).  Defendant subsequently sought further assurances from Governor Linda Lingle, as the current Governor of Hawaii, and the Attorney General's Office.

When Plaintiff learned that she was placed on the supplemental list, she also learned that she was to remain on unpaid leave until the problem was resolved, according to her subsequent complaint to the Equal Employment and Opportunity Commission ("EEOC") and the Hawaii Civil Rights Commission ("HCRC").  (Def's Ex. R.)  Defendant purportedly did not have any unarmed guard positions available.   Unhappy with her current position, on November 14, 2005,

7

Plaintiff applied for a position with a competitor, Akal Security, Inc., after which she was offered an employment position with the company's Hickam Air Force Facility.[4]  (Def's Ex. N, O.)  Defendant was terminated in December 2005, and, that same month, Defendant, through its agents, called Plaintiff's new employer, to obtain the return of Plaintiff's equipment.  On January 18, 2006, Plaintiff filed a claim with the EEOC and the HCRC.

On August 20, 2007, Defendant filed the instant Motion for Summary Judgment to dismiss the remaining claims against it.  On October 18, 2007, Plaintiff opposed that motion.  On October 26, 2007, Defendant filed its reply.[5]

## STANDARD OF REVIEW

Rule 56 requires summary judgment to be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R.

---

[4] According to Plaintiff's counsel, Plaintiff is no longer employed with Akal Security, apparently through no fault of her own.  She currently is employed through a security company that has positioned her at Honolulu airport, where she carries a gun.

[5] According to Local Rule 7.4, Defendant filed its reply one day late. Because Plaintiff has not sought to strike the reply and the Court predominantly relies on the arguments in Defendant's motion, the Court will not strike the reply.

Civ. P. 56(c); see also Porter v. California Dept. of Corrections, 419 F.3d 885, 891

(9th Cir. 2005); Addisu v. Fred Meyer, Inc., 198 F.3d 1130, 1134 (9th Cir. 2000).

A main purpose of summary judgment is to dispose of factually unsupported

claims and defenses.  Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).

Summary judgment must be granted against a party that fails to

demonstrate facts to establish what will be an essential element at trial.  See id. at

323.  A moving party without the ultimate burden of persuasion at trial–usually,

but not always, the defendant–has both the initial burden of production and the

ultimate burden of persuasion on a motion for summary judgment.  Nissan Fire &

Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1102 (9th Cir. 2000).  The burden

initially falls upon the moving party to identify for the court those "portions of the

materials on file that it believes demonstrate the absence of any genuine issue of

material fact."  T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d

626, 630 (9th Cir. 1987) (citing Celotex Corp., 477 U.S. at 323).

Once the moving party has carried its burden under Rule 56, the

nonmoving party "must set forth specific facts showing that there is a genuine

issue for trial" and may not rely on the mere allegations in the pleadings.  Porter,

419 F.3d  at 891 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256

(1986)).  In setting forth "specific facts," the nonmoving party may not meet its

burden on a summary judgment motion by making general references to evidence without page or line numbers.  S. Cal. Gas Co. v. City of Santa Ana, 336 F.3d 885, 889 (9th Cir. 2003); Local Rule 56.1(f) ("When resolving motions for summary judgment, the court shall have no independent duty to search and consider any part of the court record not otherwise referenced in the separate concise statements of the parties.").  "[A]t least some 'significant probative evidence'" must be produced.  T.W. Elec. Serv., 809 F.2d at 630  (quoting First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 290 (1968)).  "A scintilla of evidence or evidence that is merely colorable or not significantly probative does not present a genuine issue of material fact."  Addisu, 198 F.3d at 1134.

When "direct evidence" produced by the moving party conflicts with "direct evidence" produced by the party opposing summary judgment, "the judge must assume the truth of the evidence set forth by the nonmoving party with respect to that fact."  T.W. Elec. Serv., 809 F.2d at 631.  In other words, evidence and inferences must be construed in the light most favorable to the nonmoving party.  Porter, 419 F.3d at 891.  The court does not make credibility determinations or weigh conflicting evidence at the summary judgment stage.  Id.  However, inferences may be drawn from underlying facts not in dispute, as well as from

disputed facts that the judge is required to resolve in favor of the nonmoving party.

T.W. Elec. Serv., 809 F.2d at 631.

## DISCUSSION

Defendant seeks summary judgment arguing that (1) Plaintiff cannot maintain a hostile work environment claim based on the single incident of "sexual harassment" in the restroom and (2) Plaintiff cannot maintain a retaliation claim because Defendant did not engage in any unlawful employment practices and Defendant did not retaliate in response to Plaintiff's opposition to such.  Plaintiff argues otherwise, focusing on the incident as a whole, including her co-workers' laughter in response to hearing about the incident.  Plaintiff also argues that Defendant's reasons for placing Plaintiff on the supplemental list, terminating her, and contacting her new employer are pretextual; instead, Plaintiff contends that the real reason for those acts were to retaliate against her for opposing the incident of sexual harassment.

### A.  Sexual Harassment Based on a Hostile Work Environment

Plaintiff brings a claim of hostile work environment based on sexual harassment.  Title VII provides, in part, "[i]t shall be an unlawful employment practice for an employer . . . to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms,

11

conditions, or privileges of employment, because of such individual's . . . sex . . . ." 42 U.S.C. § 2000e-2(a)(1).  Haw. Rev. Stat. § 378-2(10(A) provides, in pertinent part, "[i]t shall be an unlawful discriminatory practice . . . [b]ecause of [] sex . . . [f]or any employer . . . to discriminate against any individual in compensation or in the terms, conditions, or privileges of employment[.]"  Courts generally recognize two forms of sexual harassment: quid pro quo and hostile work environment.  See Ellison v. Brady, 924 F.2d 872, 875 (9th Cir. 1991); Nelson v. Univ. of Hawaii, 38 P.3d 95, 106 (Haw. 2001).  "In 'quid pro quo' cases, employers condition employment benefits on sexual favors."  Ellison, 924 F.2d at 875.  "In 'hostile environment' cases, employees work in offensive or abusive environments."  Id.

"To establish a hostile work environment based on sexual harassment, a plaintiff must show that '(1) she was subjected to verbal or physical conduct of a sexual nature; (2) the conduct was unwelcome; and (3) the conduct was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive work environment.'"  Hale v. Hawaii Publications, Inc., 468 F. Supp. 2d 1210, 1220 (D. Haw. 2006) (quoting Porter v. California Dept. of Corrections, 419 F.3d 885, 892 (9th Cir. 2005)).   Hawaii has adopted factors similar to those under Title VII.  See Nelson, 38 P.3d at 106.  To establish a hostile work environment under Hawaii law, Plaintiff must prove that (1) she was

12

subjected to conduct of a sexual nature, (2) that was unwelcome, and (3) the conduct was severe or pervasive and served the purpose of interfering with her work performance or creating an intimidating, hostile, or offensive work environment.  See id.

The work environment must be objectively and subjectively hostile. See Hale, 468 F. Supp. 2d at 1220.  To determine the objectivity component, the Court must look to whether the environment was hostile from the perspective of a reasonable woman.  See Dominguez-Curry v. Nevada Transp. Dept., 424 F.3d 1027, 1034 (9th Cir. 2005).  Factors to consider include the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  Id. at 1034 (9th Cir. 2005) (quoting Clark Cty. Sch. Dist. v. Breeden, 532 U.S. 268, 270-71 (2001)).  "'Simple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" Id. (quoting Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998)).

Here, Plaintiff complains of a single, sexually harassing incident, that is, the restroom incident, which she perceived as being subjectively hostile and offensive.  The Court has no doubt that seeing a man in a women's restroom,

13

peeking through an opening in a door while the woman is washing herself partially

undressed at the sink would be subjectively hostile, offensive, and plain

embarrassing.   Nonetheless, that incident, as offensive and inappropriate as it was,

does not rise to the level of a hostile work environment.  The Ninth Circuit has

recognized that a single incident of sexually harassing conduct may rise to the level

of a hostile work environment, but only if it is "extremely severe." Brooks v. City

of San Mateo, 229 F.3d 917, 926 (9th Cir. 2000); see also Saxton v. Am. Tel. &

Telegraph Co., 10 F.3d 526, 533 (7th Cir. 1993) (finding that "'relatively isolated'

instances of non-severe misconduct will not support a hostile environment claim").

Sexual assault or rape serve as examples of isolated incidents that might rise to the

level of a hostile work environment.  See Little v. Windermere Relocation, Inc.,

301 F.3d 958, 967 (9th Cir. 2002); id. (citing Al- Dabbagh v. Greenpeace, Inc., 873

F. Supp. 1105, 1111 (N.D. Ill. 1994)).  Even if such an "extremely severe" episode

comes to pass, however, the Court still must determine whether that "single

incident can so permeate the workplace as to support a hostile work environment

claim." Id.  The Court finds that, in the instant case, the single incident of sexual

harassment alleged in the women's restroom, while offensive to any reasonable

woman, "did not impair [Plaintiff's] ability to do her job in the long-term."

Brooks, 229 F.3d at 926.  If the "peeping Tom" had approached Plaintiff or

14

assaulted her in any way, a different result may follow.  But, the isolated act of

staring at Plaintiff in a women's restroom during the day time in an incident that

lasted only a matter of minutes would not, to a reasonable woman, create an

objectively offensive working environment.[6]

      Still, Plaintiff would argue that the inappropriate reaction of her co-

workers, that is, their laughter at the incident, created an objectively hostile work

environment.  The Court would disagree, finding that, while the reaction of

Plaintiff's co-workers may have been inappropriate, given the situation, their one-

time reaction "did not so pollute the workplace that it altered the conditions of her

employment."[7]  <u>Manatt v. Bank of Am.</u>, 339 F.3d 792, 798 (9th Cir. 2003).   Based

on the factual allegations, the Court finds that Plaintiff has failed to create a

genuine issue of material fact concerning whether the restroom event could amount

to a hostile work environment because, based on the facts, that isolated incident

---

[6]     The Court also notes that Plaintiff was a black belt in karate for self-defense.  (<u>Pl's Dep.</u> at 68.)  Still, the Court does not consider that crucial to the instant inquiry because the analysis focuses on the perspective of a reasonable woman, not the perspective of a reasonable woman with specialized skills.  That Plaintiff may have had more training than the average woman does not mean that she was less anxious or less offended by the experience, particularly given that the man behind the door was a uniformed officer with a gun belt.

[7]     If Plaintiff's co-workers continued to harass her based on the incident, that is not at all clear from Plaintiff's brief.

legally could not rise to that level.  The Court, therefore, GRANTS summary judgment on Plaintiff's hostile work environment claim based on sexual harassment under Title VII and Haw. Rev. Stat. chapter 378.  In doing so, the Court DISMISSES Count III insofar as the sexual harassment claim is concerned under Haw. Rev. Stat. chapter 378, and the Court DISMISSES Count IV.[8]

      B.  <u>Retaliation under Title VII and Haw. Rev. Stat. chapter 378</u>

Plaintiff also claims that Defendant retaliated against her under Title VII and Haw. Rev. Stat. chapter 378 by placing her on the supplemental list due to questions concerning her previous pardon, terminating her, and contacting her new employee to harass Plaintiff.  Title VII prohibits "an employer [from] discriminat[ing] against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3(a).  Hawaii likewise makes it unlawful for an employer "to discharge, expel, or otherwise discriminate against any individual because the

---

[8]    The Court need not address Defendant's other arguments that Defendant lacked control over the third-party harasser or the area where the restroom was located because it finds, in the first instance, that the incident did not rise to the level of a hostile work environment.

individual has opposed any practice forbidden by this part or has filed a complaint,

testified, or assisted in any proceeding respecting the discriminatory practices

prohibited under this part[.]"  Haw. Rev. Stat. § 378-2(2).

Violations of the anti-retaliation provisions may be established in two

ways:  (1) an employee's opposition to an unlawful employment practice or (2) an

employee's "participation in the machinery" created to enforce those provisions.

See Hashimoto v. Dalton, 118 F.3d 671, 680 (9th Cir. 1997) (citation and internal

quotation marks omitted); see also Haw. Rev. Stat. § 378-2(2) (forbidding

retaliation because of opposition to an unlawful employment practice or filing a

complaint).  A prima facie case of retaliation for opposing an unlawful

employment practice may be proven through evidence that the plaintiff (1)

engaged in a protected activity; (2) was subjected to an adverse employment

action; and (3) a causal link existed between the two.  See Little, 301 F.3d at 969;

Black v. City & County of Honolulu, 112 F. Supp. 2d 1041, 1049-50 (D. Haw.

2000).  The adverse action may be any employment action that is materially

adverse from an objective standpoint, that is, from the standpoint of a reasonable

employee.  See Burlington Northern and Santa Fe Ry. Co. v. White, 126 S. Ct.

2405, 2415-17 (2006).  To make such a determination, "[c]ontext matters."  Id. at

2415.  That is so "because the significance of any given act of retaliation will often

17

depend upon the particular circumstances." <u>Id.</u>  The causal link may be established

through either direct or circumstantial evidence.  <u>See</u> <u>Stegall v. Citadel</u>

<u>Broadcasting Co.</u>, 350 F.3d 1061, 1068-69, 1075 (9th Cir. 2003) (Ferguson, J.,

majority; Gould, J., dissenting).

      If Plaintiff sets forth a prima facie case of retaliation, "the 'burden

shifting' scheme articulated in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792,

93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), applies."  <u>Stegall</u>, 350 F.3d at 1066; <u>see</u>

<u>also</u> <u>Furukawa v. Honolulu Zoological Soc.</u>, 936 P.2d 643, 648-49 (Haw. 1997)

(applying the same burden-shifting approach as that under federal law).  Once a

prima facie case has been established, the burden then shifts to the defendant to

prove a legitimate, nondiscriminatory reason for the adverse action.  <u>See</u> <u>Stegall</u>,

350 F.3d at 1066; <u>see also</u> <u>Hernandez v. Spacelabs Medical Inc.</u>, 343 F.3d 1107,

1112 (9th Cir. 2003).  If such a reason is proffered, the burden shifts back to the

plaintiff to prove that the proffered nondiscriminatory reason is pretext, with

pretext being shown either "by 'directly persuading the court that a discriminatory

reason more likely motivated the employer[,] or indirectly by showing that the

employer's proffered explanation is unworthy of credence.'"  <u>Stegall</u>, 350 F.3d at

1066 (quoting <u>Texas Dep't of Cmty. Affairs v. Burdine</u>, 450 U.S. 248, 256

(1980)).  If circumstantial evidence is used, that evidence must be "specific" and "substantial."  Id.

Here, because the alleged retaliatory activity occurred before Plaintiff filed her claim with the EEOC and the HCRC on January 18, 2006, the adverse employment action must have occurred as a result of Plaintiff's opposition to the incident of sexual harassment.  Plaintiff alleges that she engaged in protected activity by informing the Honolulu Police Department (HPD) of the incident in the restroom.  (Pl's Depo. at 35; Def's Ex. R.)  Defendant takes an unreasonably narrow view of what constitutes "opposition" to protected activity, claiming that Plaintiff did not oppose Defendant at that time, thereby prompting retaliatory actions against her.  Rather, Defendant claims that Plaintiff only opposed the harasser's unlawful conduct, thus apparently providing no reason for Defendant to retaliate against her.  The Court disagrees.

It is true that, in or around August 2005, Plaintiff only complained about the harassing incident that occurred in the women's restroom because, at that time, she could not maintain a claim of retaliation against Defendant.  As events unfolded, however, Plaintiff gained reason to oppose Defendant's retaliatory behavior, about which she complained in January 2006.  After the restroom incident, the evidence, if proven, suggests that Plaintiff was placed on leave

19

because of medical and psychological issues, at the advice of her doctors. When

Plaintiff returned, she learned that she was placed on a supplemental list, which,

according to her claims, apparently meant that she would be placed on unpaid

leave, similar to a suspension. (Def's Ex. R.) She was placed on that leave even

though Defendant may have received sufficient clarification of her pardon to

permit her to continue to work. Plaintiff subsequently was fired for the stated

reason of seeking and obtaining outside employment with a competitor, after which

Defendant contacted Plaintiff's new employer to obtain her equipment. Plaintiff

claims, however, that she was terminated, in part, in retaliation for complaining

about the restroom incident and that Defendant contacted her new employer before

first contacting her to harass and possibly to disparage her with her new employer.

That, too, she claims was in retaliation for her opposition to the harassing conduct

in the restroom.

Although Defendant provides "legitimate" reasons for each of its

actions, as the Court will discuss, Plaintiff's factual allegations may suggest that, if

proven, Defendant engaged in those actions, under a mixed motive framework, in

retaliation for Plaintiff's act of speaking out against the harassing conduct in the

women's restroom. Initially, Plaintiff argues that the following actions rise to the

level of materially adverse employment actions from an objective standpoint as a

result of opposing the restroom incident: (1) the act of being placed on the supplemental list on November 22, 2005, (2) the act of being terminated from employment in December 2005, and (3) the act of contacting Plaintiff's new employer. As such, the burden shifts to Defendant to show legitimate, nondiscriminatory reasons for its actions.

First, Defendant claims that the reason Plaintiff was placed on the supplemental list was because it had questions concerning Plaintiff's ability to carry a firearm, even in light of her pardon. That question arose following Plaintiff's application for a weapons permit to join a local gun club, which presumably is what prompted Plaintiff to take the firearms course in April 2005, thereby triggering Defendant's concern. According to the letter dated October 14, 1981 from the Department of the Attorney General, Defendant's concern certainly would have been legitimate, as that letter made clear that a pardon did not necessarily entitle the pardoned person to carry a firearm. Because of that letter, Defendant was concerned that it could be held criminally liable for permitting Plaintiff to carry a firearm while on duty, which seems reasonable.

The reasonableness of Defendant's concern is called into question, however, in light of former Governor Ariyoshi's July 19, 2005 letter clarifying his intent behind the pardon. Ariyoshi was the Governor who pardoned Plaintiff, and,

in his letter of intent, he specifically stated that his intent was to grant Plaintiff "all legal rights," including "the right to bear arms in her work."  That letter could have alleviated some of Defendant's concerns, if not all, providing Defendant with reason to allow Plaintiff to continue with her duties until a definite decision was reached on the matter.  Defendant disagrees, asserting that, because Ariyoshi no longer was Governor, his opinion counted for nothing more than that of an average attorney.  The Court understands that Defendant may have been concerned about Governor Lingle's stance on the issue, as the current Governor of Hawaii.  Nonetheless, Ariyoshi, as the Governor who pardoned Plaintiff, had personal knowledge of the pardon and, therefore, his intent behind the pardon, which certainly could have given his opinion more weight than that of the average attorney.

Moreover, Defendant's concern may be called into question in light of Plaintiff's excellent employment record, which past employment positions apparently included the use of a firearm.  On February 16, 1990, Plaintiff had received a Certificate of Training from the Sheriff's Department for law enforcement, with the State of Hawaii Judiciary appointing Plaintiff "Deputy Sheriff of Hawaii" that day.  (Pl's Ex. 1, 2.)  That certification and position suggest that the State of Hawaii found Plaintiff qualified to bear arms, possibly lessening

22

any reason for concern.  In 1997, Plaintiff's manager highly recommended her for a position with the Department of Public Safety, finding Plaintiff to be "of the highest moral standards and of outstanding character."  (Pl's Ex. at 7.)  On July 10, 2005, around the time that questions began to arise concerning Plaintiff's pardon, she was "commended for [her] diligence and dedication to duty" and congratulated for her "[g]ood job."  (Pl's Ex. 4.)  Moreover, on June 23, 2005, while the inquiry was ongoing, an Assistant Security Officer at the Naval Station, Pearl Harbor, who apparently had worked with Plaintiff, described Plaintiff as "an outstanding employee," among other high remarks.  (Pl's Ex. 8.)  That employment record does not suggest that Plaintiff was at risk of abusing her privilege of bearing arms on duty until a final decision had been made.

As of August 2005, a decision from the Attorney Generals Office, to which Governor Lingle's office apparently had referred Defendant on the issue, still was pending.  (Def's Ex. E.)   As of November 2005, a decision still had not been made, otherwise Defendant would not have had reason to place Plaintiff on the supplemental list.  Between that time, the channels of communication must have shifted, as Defendant advised Plaintiff on November 22, 2005 to "get clarification from the Parole Board regarding her pardon," not from the Attorney General's Office, creating some confusion as to who was the appropriate contact or

23

decision maker on the matter.  (Def's Ex. H.)  To a lesser degree, the Court is

concerned with the confusion surrounding the appropriate contact, thus creating

another obstacle to Plaintiff's ability to seek clarification from a more appropriate

person.  Of course, Defendant did not create that obstacle, but, in light of the

difficulties in obtaining a final decision, Defendant reasonably could have relied on

the other evidence, such Ariyoshi's letter of intent and Plaintiff's solid

employment record with use of a firearm, as a reasonable justification for

permitting Plaintiff to continue with her work, as Plaintiff's other employers

apparently did without repercussion.  Consequently, despite Defendant's failure to

gain a final decision on the matter, thus possibly making its concern reasonable,

given the other evidence presented on this issue and the circumstances surrounding

the events as they unfolded, the Court finds that genuine issues of material fact

exist at this time as to whether Defendant's reason for placing Plaintiff on the

supplemental list was pretextual or legitimate.

        Second, Plaintiff provides, as evidence of the retaliation against her,

Defendant's act of terminating her.  Defendant claims that Plaintiff was terminated

because she sought outside employment with a competitor, in violation of the

Security Officer Policy and Procedure Manual ("Manual"), 203.30, and possibly

because she left her post on the day of the incident to use the women's restroom in

24

violation of the Manual, 203.60 ("Abandoning Post").[9] (Def's Ex. U.)  Although
Plaintiff sought and obtained employment with a competitor, Akal Security, in
violation of the Manual, before she was terminated, that act, when viewed in
context, may create an inference of Defendant's retaliatory behavior against
Plaintiff.  Although insufficient to be considered direct evidence of discriminatory
animus or evidence of retaliation alone, the termination may serve as
circumstantial evidence of Defendant's chain of retaliatory behavior, creating a
genuine issue of material fact as to whether the restroom incident at least was a
motivating factor in the discipline.  See Stegall, 350 F.3d at 1068 (finding that
circumstantial evidence at least was sufficient to raise a genuine issue of material
fact as to whether an illegitimate reason was at least a motivating factor in the
plaintiff's dismissal).

        Third, the same can be said of Plaintiff's allegation that, upon
obtaining the new employment position, Defendant, through its agents, called
Plaintiff's new employer to harass her, possibly in the attempt to punish her.
Defendant claims that it contacted Plaintiff's new employer to obtain the return of
Plaintiff's equipment because its attempt to contact Plaintiff about the equipment

---

        [9]      The Court is unclear whether Plaintiff's decision to "abandon her
post" to use the women's restroom on August 22, 2005 was used as a reason for
her termination.

was unsuccessful.  Plaintiff disputes that Defendant contacted her before contacting Plaintiff's new employer.  During the hearing, Plaintiff's counsel discussed what either he or Plaintiff believed had occurred during the conversation(s) between Defendant and Akal Security.  Because the record does not reflect the details of the conversation, the Court, at this time, will not consider Plaintiff's arguments pertaining to the details of that conversation.  The Court merely finds that a genuine issue of material fact exists concerning the purpose of that conversation, that is, whether Defendant initiated contact with Plaintiff's new employer, before contacting Plaintiff, to harass her, to obtain Plaintiff's equipment, or for a mixture of those reasons.[10]  Again, as with Plaintiff's arguments surrounding the termination, although that act would be insufficient to be considered direct evidence of discriminatory animus or evidence of retaliation alone, it may serve as circumstantial evidence of Defendant's chain of retaliatory behavior.

---

[10]     Although Defendant emphasizes Plaintiff's admission in her deposition testimony that she did not suffer any type of punishment, discipline or anything else as a result of the phone calls to her new employer, (Pl's Depo. at 79), that goes to damages for a trier of fact to determine at trial, not to Defendant's motive in contacting Plaintiff's new employer.

In conclusion, the Court finds that, based on the reasons that both sides propound for Defendant's actions, this case arguably is a mixed motive case. See Stegall, 350 F.3d at 1067; see also French v. Hawaii Pizza Hut, Inc., 99 P.3d 1046, 1059 n.17 (Haw. 2004) (describing the mixed motive approach in terms of proving disparate treatment, citing Shoppe v. Gucci Am., Inc., 14 P.3d 1049, 1059 (Haw. 2000)); Furukawa, 936 P.2d at 649 (determining that although "federal court's interpretation of Title VII is not binding on this court's interpretation of civil rights laws adopted by the Hawai'i legislature," the analytical framework applied can be useful).  Mixed motive cases have been described in the following way:

> [I]n cases in which the evidence could support a finding that discrimination is one of two or more reasons for the challenged decision, at least one of which may be legitimate, the jury should be instructed to determine first whether the discriminatory reason was "a motivating factor" in the challenged action. If the jury's answer to this question is in the affirmative, then the employer has violated Title VII.

Id. (quoting Costa v. Desert Palace, 299 F.3d 838, 856-57 (9th Cir. 2003)).  "In the end, the inquiry is straightforward: '[p]ut simply, the plaintiff in any Title VII case may establish a violation through a preponderance of evidence (whether direct or

27

circumstantial) that a protected characteristic played "a motivating factor.'"" <u>Id.</u> at 1068 (quoting <u>Costa</u>, 299 F.3d at 856-57).  Defendant's reasons for its actions very well may be legitimate, but, as Plaintiff has set forth, there may be more than one reason for Defendant's actions, the other of which may be retaliatory in nature.   If the retaliatory reasons were "motivating factors" in Defendant's decisions, which is for the trier of fact to determine at a later stage, then Defendant may be in violation of Title VII and Haw. Rev. Stat. chapter 378.  As the Supreme Court recently stated in <u>Burlington Northern and Santa Fe Ry. Co.</u>,  "[c]ontext matters." 126 S. Ct. at 2415. (2006).  The Court finds that, in light of the evidence presented of Defendant's retaliatory behavior when viewed in the context of this case, Plaintiff has presented genuine issues of material fact as to whether Defendant acted with retaliatory motives, at least in part, under Title VII and Haw. Rev. Stat. § 378-2, and whether those retaliatory motives played a motivating factor in Defendant's disciplinary decisions.

CONCLUSION

For the reasons stated above, the Court GRANTS IN PART AND DENIES IN PART Defendant's Motion for Summary Judgment.  Genuine issues

of material fact exist concerning Plaintiff's retaliation claim against Defendant

under Title VII and Haw. Rev. Stat. chapter 378.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, November 7, 2007.



_____
David Alan Ezra
United States District Judge

Laverne Lavarias vs. Hui O Ka Koa, LLC, Civil No. 06-00481 DAE-LEK;
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT